See also 12 F.R.D. 195.

**FIRST TRUST & SAVINGS BANK OF ZANESVILLE, OHIO, v. FIDELITY-PHILADELPHIA TRUST CO.**

Civ. A. No. 12264.

United States District Court
E. D. Pennsylvania.

May 28, 1953.

762

Pugh, Knapp & Miller, Zanesville, Ohio, Speiser, Satinsky, Gilliland & Packel, Philadelphia, Pa., for plaintiff.

J. Wesley Oler, John R. McConnell, Arthur Littleton, Philadelphia, Pa., Morgan, Lewis & Bockius, Philadelphia, Pa., of counsel, for defendant.

CLARY, District Judge.

Plaintiff, The First Trust and Savings Bank of Zanesville, Ohio, (which for brevity will be hereinafter referred to as "Zanesville") has brought this action to recover from the defendant, Fidelity-Philadelphia Trust Company (hereinafter referred to as "Fidelity"), the sum of $82,000 with interest and costs. The basis of the action is the purchase by Zanesville in July of 1950 of four spurious or worthless collateral notes from Philadelphia Acceptance Corporation (hereinafter referred to as "PAC"). From the pleadings and proof I make the following:

### Findings of Fact

1. Plaintiff, Zanesville, is an Ohio banking corporation, and defendant, Fidelity, is a Pennsylvania banking corporation. The matter in controversy exceeds,

exclusive of interest and costs, the sum of $3,000.

2. On or about March 31, 1939, Zanesville purchased its first collateral distiller's note from PAC, a broker dealing in liquor distillers' notes. Thereafter, and through July of 1950, Zanesville bought from PAC approximately 220 such notes.

3. The general course of conduct in all such transactions was as follows: PAC would offer to Zanesville by telephone, telegram or letter, one or more promissory notes of whisky distillers, secured by whisky warehouse receipts. Zanesville either accepted or rejected these offers by telephonic communication with PAC.

4. During the first few years of business transactions between Zanesville and PAC, the following method was employed: PAC, after acceptance of its offer by Zanesville, would send the note or notes, its draft or drafts, and whisky warehouse receipts directly to Zanesville, which would retain the notes and collateral whisky warehouse receipts and send its check to PAC. This method of operation involved such detailed paper work at Zanesville that in 1942 one of Zanesville's tellers requested PAC's agent to suggest a less burdensome method of handling the PAC paper and collateral. PAC's agent then suggested that the whisky warehouse receipts (the collateral for the distillers' notes) be deposited with Fidelity for safekeeping and that only the safekeeping receipts be transmitted to Zanesville. PAC's agent pointed out that this method would facilitate the release of whisky warehouse receipts to the distiller in the event that substitution of whisky warehouse receipts was necessary or desirable and in addition would save time and expense in shipping the receipts from Philadelphia to Zanesville, Ohio, and return. W. E. Decker, then cashier of Zanesville and now its president, was consulted. He agreed that such a procedure would produce the advantages indicated and thereupon by simple oral agreement between Decker and PAC's agent that method of handling the whisky warehouse receipts was adopted by the parties.

5. There was no express agreement between Zanesville and Fidelity with respect to the method of handling the collateral whisky warehouse receipts supporting distillers' notes sold by PAC to Zanesville. Between 1938 and 1950 Fidelity issued some 2,145 safekeeping receipts to Zanesville and to other banks throughout the United States. The certificates were kept in individual folders in the vaults of Fidelity. Fidelity did not keep a master record of the distillers' notes or of the whisky warehouse receipts which it handled. Each such transaction was treated individually and the whisky warehouse receipts involved were kept separately as the property of the banks to which Fidelity issued its safekeeping receipts. Fidelity made no profit from these transactions. Its charge of $2 for each safekeeping receipt, regardless of the number of whisky warehouse receipt certificates involved, was sufficient only to pay for the clerical work involved in the handling of these certificates. At no time did Fidelity release any of the whisky certificates except at the written order and request of Zanesville.

6. On a few occasions after 1942, the original method of handling such transactions was followed, viz., Zanesville took into its own possession the whisky warehouse receipts involved as collateral in those few transactions.

7. After the adoption of the new system, the transactions insofar as Fidelity was concerned in the sale of the notes by PAC to Zanesville were handled as follows: After Zanesville agreed directly with PAC to buy one of these notes, PAC would send its messenger to the Corporate Trust Department and to the Collection Department of Fidelity, each being a separate department of the bank physically separated and located in different areas of the banking floor. To the Corporate Trust Department, the messenger would deliver a letter signed by PAC enclosing the warehouse receipt or receipts (registered in PAC's name and endorsed by it) and an unsigned duplicate copy of the distiller's note, and said letter would request the Corporate Trust Department to issue its safekeeping receipt to Zanesville and to deliver same to Fidelity's Collection Department to send to Zanesville along with the

original note and PAC's draft drawn on Zanesville. The PAC messenger would then deliver to the Collection Department the original of the distiller's note so drawn and endorsed as to be in negotiable form, a sight draft drawn by PAC to its own order, endorsed by PAC and drawn on Zanesville, and a deposit slip. After preparing a safekeeping receipt, Fidelity's Corporate Trust Department would put a copy of the safekeeping receipt and a copy of the note and the original warehouse receipt in a folder marked for the Zanesville bank and then transmit the original safekeeping receipt to its Collection Department. The folders were kept individually in Fidelity's vaults. The Collection Department would then attach the original of the safekeeping receipt to PAC's draft bearing Fidelity's stamped collection endorsement and the original distiller's note and forward those papers by registered mail to Zanesville together with a transmittal form requesting payment.

8. On the same day that the transaction outlined in the foregoing finding of fact was accomplished, PAC would send directly to Zanesville a written confirmation of the sale of the note by PAC to Zanesville together with an independent appraisal of the market value of the whisky security made by Harold S. Laden & Company, a qualified appraiser, as well as a letter from PAC enclosing check in payment of a prior note being replaced by the new note.

9. In due course Zanesville would mail a check to Fidelity drawn by Zanesville upon its account in the Chase National Bank of New York (hereinafter referred to as "Chase") in payment of the note. The check was made payable to Fidelity in accordance with the instructions given to Zanesville by PAC.

10. Immediately upon the mailing by the Collection Department of the note, draft and safekeeping receipt to Zanesville, Fidelity would give credit to PAC in its checking account in Fidelity for the face amount of the uncollected draft. When the draft was paid by Zanesville's check, Fidelity reimbursed itself from the proceeds and charged interest to PAC for the number of days required to collect the draft.

11. The practice of giving credit for uncollected drafts when drawn on other banking institutions or on brokers and charging interest therefor for the time required to collect the drafts was a common accepted banking practice.

12. Upon receipt by Fidelity of Zanesville's check, as described in finding of fact No. 9, it would deposit it with the Federal Reserve Bank of Philadelphia on the same day it was received, getting immediate credit from the Federal Reserve Bank; the Federal Reserve Bank of Philadelphia would then forward the Zanesville check to Chase through the Federal Reserve Bank of New York for collection on the following day.

13. On July 3, 1950, PAC sold to Zanesville note SY–266 of the Alexander Young Distilling Co. in the sum of $20,000 and on the same day sent its check for $22,000 drawn on Fidelity to the order of Zanesville to pay off note SY–253A of the same company, which note was to mature on August 7, 1950. Accompanying the communication was a new appraisal of Harold S. Laden & Company for Zanesville's files. Note SY–266 dated July 3, 1950 and also due August 7, 1950 was transmitted by PAC to Fidelity in accordance with the method of operation set forth in finding of fact No. 7, together with negotiable U. S. Bonded Warehouse Receipt No. 542 of Carrollton Springs Pure Rye Distillery, Inc. covering 650 barrels of Bourbon Whisky in new cooperage. In accordance with the established practice, the note, draft and safekeeping receipt were sent by Fidelity to Zanesville and Zanesville sent its check to Fidelity in payment of said note and this payment was collected by Fidelity in the manner described in finding of fact No. 9.

14. On July 14, 1950, PAC sold to Zanesville distiller's note ST–287 of Carrollton Springs Pure Rye Distillery, Inc. in the amount of $24,000 secured by Whisky Warehouse Receipt No. 712 covering 431 barrels of Bourbon Whisky in new cooperage, which transaction conformed to the usual procedure described in findings of

fact Nos. 7 and 9, and it was paid for by Zanesville in the same manner and fashion therein described. On the same day PAC sent its check for $25,000 drawn on Fidelity to Zanesville to pay off note ST–283 of Carrollton Springs Pure Rye Distillery, Inc. which note bore the same maturity date as note ST–287.

15. On July 18, 1950, PAC sold to Zanesville note SC–218 of Brookside Distilling Products Corporation in the amount of $19,000 to mature August 7, 1950 and collaterally supported by Receipts Nos. 574 and 634 of Carrollton Springs Pure Rye Distillery, Inc. covering 496 barrels of Bourbon Whisky in new cooperage. This transaction followed the same course as outlined in findings of fact Nos. 7 and 9 and was paid for by Zanesville. On the same date PAC sent its check for $20,000 drawn on Fidelity to Zanesville to pay off note SC–192 of the Brookside Distilling Products Corporation, which note likewise was to mature on August 7, 1950.

16. On July 21, 1950, PAC sold to Zanesville note SY–274 of the Alexander Young Distilling Company in the amount of $19,000 which note was to mature on August 7, 1950, and was secured by Warehouse Receipt No. 537 of Carrollton Springs Pure Rye Distillery, Inc. covering 600 barrels of Bourbon Whisky. This transaction followed the usual procedure set out in finding of fact No. 7. PAC sent the original and unsigned copy of the note to the Corporate Trust Department of Fidelity, which issued its safekeeping receipt, and the Collection Department sent the note, draft, safekeeping receipt and its collection form to Zanesville. PAC on the same day sent its check, drawn on Fidelity, in payment of note SY–266, the transaction referred to in finding of fact No. 13. In accordance with established practice, Zanesville returned note SY–266 and the Fidelity safekeeping receipt issued in connection therewith directly to PAC. It likewise sent its check for $19,000 to Fidelity in payment of note SY–274, and deposited for collection PAC's check for $20,000 drawn as aforesaid on Fidelity.

17. Over a period of many years, Charles W. Collom, president and apparently sole stockholder of PAC, had transacted the business of PAC with Fidelity with two vice presidents of Fidelity who handled that account, Miles S. Altemose and Harry C. Barnes. His association with Barnes was such that at one time Collom and Barnes jointly owned a prize bull. On July 26, 1950 Altemose was in Pittsburgh, Pennsylvania, attending a meeting of a Board of Directors of which he was a member, and was not in the bank at the time of the occurrences set forth in the next two succeeding findings of fact. The record of this case does not disclose whether Harry C. Barnes was at his desk in the bank on July 26, 1950. However, Mr. Barnes on the date of the trial of this case was still a vice president of Fidelity and was available for subpoena to either side. Counsel for Fidelity was not requested to have Mr. Barnes in court for the trial and no facts appeared at the trial which required the production of Mr. Barnes as a witness by Fidelity.

18. On July 25, 1950, Fidelity received Zanesville's check for $19,000 dated July 24, 1950, drawn on Chase and payable to Fidelity, in payment of the draft drawn by PAC on Zanesville on July 21, 1950, and for which Fidelity had given PAC immediate credit. Fidelity handled this check in normal routine fashion, depositing it with the Federal Reserve Bank of Philadelphia on July 25, 1950 and getting immediate credit. It was paid by Chase on July 26, 1950, through the Federal Reserve Bank of New York, and no recall of such payment could be made after 3 p. m., the close of banking hours on that date.

19. At about 2:30 p. m. in the afternoon of July 26, 1950, Kenneth G. LeFevre, vice president and treasurer of Fidelity, was asked by a clerk to approve three items payable to PAC for immediate credit. There being someone at his desk he was unable to give the matter immediate attention but shortly thereafter he went to the Collection Department, looked at the slip requesting immediate credit, and asked for the records of the PAC account. Examining the record, he discovered that there were many uncollected items against which a number of checks had been presented for payment,

including the check of PAC to Zanesville in the amount of $20,000. Because of the status of the account and because Fidelity would, in effect, be extending an unsecured loan to PAC for the amount of the checks presented for payment, on his own responsibility as vice president and treasurer, LeFevre refused to extend further credit and instructed the Collection Department to protest all checks and to return them marked "uncollected Funds". This decision and action was based purely on sound banking principles and without any knowledge on the part of LeFevre that any of the transactions of PAC were fraudulent or were based on spurious distillers' notes and spurious whisky warehouse receipts.

20. Fidelity's first intimation of any wrongdoing on the part of Collom or PAC was after banking hours on the afternoon of July 26, 1950 at 3:30 p. m. and approximately one hour after LeFevre had taken the action outlined in the preceding finding of fact. At that time two representatives of the Peoples First Bank of Pittsburgh appeared at the desk of LeFevre and asked him to have duplicate photostatic copies made of all papers which were being recalled by that bank in connection with a draft arising out of a transaction similar in character to the Zanesville transactions, papers which belonged to the Peoples First Bank of Pittsburgh including warehouse receipts. After inquiry, LeFevre informed them that the draft had not as yet reached Fidelity's office, since it was being brought back from New York City, but that he would have their request accomplished immediately upon the opening of business on the morning of July 27, 1950. At that time the two representatives of the Peoples First Bank of Pittsburgh said nothing to LeFevre which would charge either Collom or PAC with any wrongdoing or question the authenticity of any document involved in the transaction.

21. On July 27, 1950, when LeFevre arrived at the bank, he found the same two representatives of the Peoples First Bank of Pittsburgh at the desk of the cashier of the bank, Mr. Slaughter. When Mr. Altemose returned to the bank that morning from Pittsburgh, he found these same representatives examining the original whisky warehouse receipts of Sherwood Distilling Company for which a safekeeping receipt had been issued by Fidelity to Peoples Bank. It was then and for the first time that Fidelity was informed through Mr. Altemose of possible duplication of barrel serial numbers in other Sherwood Distilling Company warehouse receipts for whisky held in Baltimore, Maryland.

22. On the same day, July 27, 1950, Fidelity sent its assistant treasurer to Baltimore to investigate the Carrollton Springs Pure Rye Distillery, Inc. and there Fidelity discovered for the first time that the purported whisky warehouse receipts of that company held by Fidelity as collateral for a loan of $300,000 made by Fidelity to PAC were spurious.

23. On the next day, July 28, 1950, Fidelity requested a Dun & Bradstreet credit report on the Carrollton Springs Pure Rye Distillery, Inc., which report was received by Fidelity on July 31, 1950. This report clearly showed that the whisky warehouse receipts of Carrollton Springs Pure Rye Distillery, Inc. including those involved in the four Zanesville transactions were spurious in that the signatures were fictitious and the persons whose signatures they purported to be had not been at the time of the issuance of the certificates in 1945 or thereafter officers of the said whisky distilling corporation.

24. PAC was declared a bankrupt and its president, Charles W. Collom, as a result thereof, was charged with criminal offenses against the laws of the United States, convicted, and sentenced to a substantial term of imprisonment.

25. Zanesville at no time prior to July 27, 1950 investigated or verified either the validity of any note which it purchased from PAC or any of the collateral furnished it as security for such note. Zanesville at no time prior to July 27, 1950 requested Fidelity to verify the validity of any note or of any collateral furnished as security for such note purchased by Zanesville. All whisky warehouse certificates transmitted by PAC to Fidelity for safekeeping for Zanesville were apparently

properly signed and in good order and form and there was nothing on the face of the certificates to put Fidelity, in the exercise of ordinary business prudence, on notice of possible fraud or invalidity.

26. Zanesville in its dealings with PAC relied upon PAC's representations; Fidelity in its dealings with PAC and in granting loans totalling $300,000 likewise relied upon PAC and its representations.

27. Fidelity in the issuance of safekeeping certificates for whisky warehouse receipts performed a ministerial and a custodial act only; the safekeeping arrangement was inaugurated by agreement between PAC and Zanesville and solely for their benefit, and not for the benefit of Fidelity.

28. The safekeeping receipts issued by Fidelity to Zanesville described the whisky certificates by number, the number of barrels and nature of the whisky therein, together with serial numbers of the barrels, the date of original inspection for tax purposes and the exact geographical location even as to buildings where the whisky was stored. This information afforded Zanesville sufficient basis at any time it desired to check on the validity of the whisky certificates or value of the security.

29. Zanesville had available to it the same facilities for investigating the value of the security as did Fidelity.

30. The only direct communications between Zanesville and Fidelity were the letter of Zanesville to Fidelity on March 14, 1949, and the reply of Fidelity to Zanesville on March 17, 1949, as follows:

"March 14, 1949
"The Fidelity-Philadelphia Trust Co.
"Broad and Walnut Streets
"Philadelphia 9, Pa.
"Attention: Mr. J. Wayne Wilson
Credit Manager
"Dear Mr. Wilson:

"For some time we have been purchasing from the Philadelphia Acceptance Corporation certain notes of Distillery Companies secured by warehouse certificates. Recently the interest rate on these notes has increased to the extent that we are concerned as to whether or not the notes that we are holding are from high grade risks.

"We would appreciate very much if you would give us an opinion as to the responsibility of the Philadelphia Acceptance Corporation and, if possible, we would also like to have some information as to the security back of the Collateral Trust Notes for which your bank is Trustee.

"Our experience over the past years with the Philadelphia Acceptance Corporation has been satisfactory with the exception of a little trouble on a note of the Alta Vineyard Company. However, we would not suffer loss on these loans. At the present we are carrying notes of the Carrollton Springs Pure Rye Distilling Corporation, the Sherwood Distilling Company and the Alexander Young Distillery.

"Any information that you might be able to give us in regard to the Philadelphia Acceptance Corporation, their Collateral Trust Notes or the three Distilleries mentioned will be greatly appreciated.

"Very truly yours,
"W. E. Decker, President
"WED :hgp"

"Fidelity-Philadelphia Trust Company
"Broad and Walnut Streets
"Philadelphia 9
"Telephone          Cable Address
"Kingsley 5–1123          "Fidelphila"
"This Information is Furnished as a Matter of Business Courtesy on the Understanding it is Confidential and No Responsibility Therefor Attaches to This Bank or any of Its Representatives.
"March 17, 1949
"Mr. W. E. Decker, President
"The First Trust and Savings Bank
"Zanesville, Ohio
"Dear Mr. Decker:

"We are glad to answer your inquiry of March 14 concerning Philadelphia Acceptance Corporation of this city.

"This corporation has had an account with us since 1938 that has been conducted properly and average balances of low five figures are maintain-

ed. From time to time we have loaned the corporation varying sums upon a secured basis, and at the present time outstandings with us are in low six figure proportions. In our dealings with this corporation we have confined our loans to those secured by whiskey in bonded warehouses in which we felt there was a ready market. These obligations have been handled in a satisfactory manner and judging from our experience, we have no reason to believe that they are other than a properly secured risk. A condensed balance sheet exhibited to us last year indicates that the net worth of the Philadelphia Acceptance Corporation is limited and is substantially less than outstanding obligations.

"With reference to your inquiry concerning this company's collateral trust notes for which we are trustee, the collateral held at present is composed mainly of a moderate six figure amount of whiskey warehouse receipts. The remaining collateral in a moderate four figure amount is composed of liquor board receivables and cash. There is presently a low six figure amount of collateral trust notes outstanding.

"We also have an account for the Alexander Young Distilling Company of this city which was opened in September, 1948, and low five figure balances are maintained. We have, on occasion, advanced sums to that company upon the assignment of accounts receivable of the Pennsylvania Liquor Control Board. Our loans are based entirely on the credit of the Pennsylvania Liquor Control Board. Outstandings of the Alexander Young Distilling Company with us last year reached a high five figure sum and are currently in medium five figure proportions. The company was out of our debt from January 6 to February 3, 1949.

", "Sincerely,
"(sgd) J. W. Wilson
"J. Wayne Wilson
"Credit Manager"

"WHN:MRC

31. On 9 out of the 12 banking days in March, preceding March 17th, there were overdrafts in the PAC account as follows:

| | | | |
|---|---|---|---|
| March | 3, 1949 | ......... | $19,592.61, |
| " | 4, " | ......... | 13,786.07, |
| " | 7, " | ......... | 4,493.05, |
| " | 8, " | ......... | 4,902.30, |
| " | 10, " | ......... | 36,239.14, |
| " | 14, " | ......... | 36,884.66, |
| " | 15, " | ......... | 6,964.29, |
| " | 16, " | ......... | 2,462.76, |
| " | 17, " | ......... | 317.44. |

In the previous month, February, the account was overdrawn as follows:

| | | | |
|---|---|---|---|
| February | 17, 1949 | ....... | $11,670.02, |
| " | 21, " | ....... | 16,954.84, |
| " | 25, " | ....... | 884.58. |

32. Despite the overdrafts set forth in the preceding finding of fact, the average monthly balance in the PAC account averaged to a credit balance in the low five figures.

33. The information furnished Zanesville by Fidelity in its communication of March 17, 1949 was factually correct and true. The balances reported by Fidelity to Zanesville were computed net of overdrafts and reflected what they purported to reflect—average balances for the month or year in question.

34. On January 16, 1947 the Collector of Internal Revenue of the First District of Pennsylvania filed a United States tax lien against Charles W. Collom in the sum of $52,930 for 1945 taxes, and on November 12, 1947, the said Collector filed a second United States tax lien for $25,397 for 1946 taxes against Charles W. Collom individually. On February 19, 1948 the Aluminum Company of America entered judgment against Charles W. Collom individually for $39,013. PAC was not involved in any of these transactions, all of them being entered against Charles W. Collom individually. Fidelity on March 17, 1949 knew of the entry of the liens and judgment against Charles W. Collom personally.

35. The action of LeFevre in returning the check of July 21, 1950 marked "uncollected funds" was based upon dissatisfac-

tion with PAC's credit and was not based upon suspicion of fraud or forgery. Neither LeFevre nor anyone else in Fidelity at that time suspected that any of the whisky warehouse receipts delivered by PAC to Fidelity for the issuance of safe-keeping receipts were forgeries.

36. The proceeds of the checks received by Fidelity from Zanesville in payment of drafts drawn on Zanesville by PAC merely reimbursed Fidelity for the credits which Fidelity had theretofore given in like amount to PAC pending collection of the draft.

37. It is customary banking practice for collecting banks to stamp an endorsement "prior endorsements guaranteed" on drafts deposited with them for collection.

38. The four drafts in question in this action drawn by PAC on Zanesville to the order of PAC and endorsed by PAC were not forged or otherwise spurious.

39. PAC registered as a dealer in whisky warehouse certificates under the provisions of the Pennsylvania Distillery Bonded Warehouse Certificate Act of June 24, 1939, P.L. 764, 47 P.S. § 801 et seq. for the years 1940 to 1944 inclusive, but it did not thereafter so register.

40. Fidelity has never registered as a dealer in whisky warehouse certificates under the provisions of the Pennsylvania Statute referred to in the previous finding of fact.

41. The information given by Fidelity to Zanesville in its letter of March 17, 1949 was a truthful statement of facts and was not in any way misleading, either by misstatements or by omission to state material facts.

42. Fidelity acted under the circumstances of this case as a reasonably prudent bank and was not negligent either in the handling of whisky warehouse receipts or in the failure to investigate the validity of the notes or the existence of the whisky collateral.

43. All the purported whisky warehouse receipts involved in the transactions set forth in findings of fact Nos. 13, 14, 15 and 16, supra, were spurious. Three of the four notes (the exception being the Brookside note which was genuine but of no value) were spurious.

44. Fidelity neither sold nor participated in the sale of the collateral notes in question by PAC to Zanesville.

45. Nothing said or done by Fidelity in respect of the four transactions involved in this suit constituted a misrepresentation or concealment of facts.

## Discussion

This case is one of many suits instituted by banks located in different States against defendant Fidelity to recover losses sustained by them through the fraudulent and deceptive practices of PAC, a broker dealing in distillers' notes and whisky warehouse certificates. Fidelity itself was victimized in purchasing from PAC the same type of distillers' notes secured by whisky warehouse certificates as are here involved.

Zanesville, plaintiff in the instant action, after dealing with PAC over a period of eleven years and purchasing from it 220 notes involving several million dollars, suffered a loss of some $82,000 by reason of the purchase of the four spurious or worthless collateral notes involved in this suit. It now seeks to recover its loss against Fidelity. Zanesville advances several grounds on which it claims to be entitled to recover.

First, Zanesville contends that Fidelity did not comply with the Distillery Bonded Warehouse Certificate Act of Pennsylvania, 47 P.S. § 801 et seq. This contention has no merit. The Act obviously has no applicability to Fidelity and, even if it did, the Act provides only criminal sanctions and makes no provision for civil liability.

The second and main contention advanced by Zanesville is that Fidelity violated sections 10(b), 12 and 17 of the Securities Act of 1933, 15 U.S.C.A. §§ 77j (b), l and q. In order to be entitled to recover under the Securities Act, Zanesville had the burden of demonstrating that Fidelity was subject to the provisions of the Act. Plaintiff earnestly contends that the facts show Fidelity to be a "seller", under

the liberal interpretation of that term in cases construing the Act, in that it participated in the sale of securities. If Fidelity is subject to the Act, the burden shifts to Fidelity to show that any statements it may have made in connection with the sale of securities were either not false or that Fidelity in the exercise of reasonable care could not have known of the falsity of the statements, and further, that any statements made by it did not omit to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading. Plaintiff contends that the safekeeping receipts issued by Fidelity contained false statements, its reasoning being that the safekeeping receipt stated that Fidelity held whisky warehouse certificates and since the certificates which Fidelity held were spurious, the statement, therefore, was false. Further, plaintiff contends Fidelity in its letter of March 17, 1949 to the plaintiff failed to state material facts necessary to make its statements in the letter not misleading in that it failed to disclose to Zanesville that PAC had overdrafts in its account for many of the banking days immediately preceding the letter and failed to disclose that the president of PAC had outstanding against him tax liens and a substantial judgment. Plaintiff further contends that if the Securities Act is applicable, any contributory negligence on the part of Zanesville is not available as a defense to Fidelity. The effectiveness of plaintiff's arguments, however, depends upon a showing that Fidelity was a "seller" within the meaning of the Act. It was incumbent upon the plaintiff to establish that relationship and it has failed to do so.

Plaintiff has cited a number of cases in support of its position. It relies principally upon those cases which indicate that a liberal interpretation should be given to the term seller, e. g., Cady v. Murphy, 1 Cir., 113 F.2d 988; Schillner v. H. Vaughan Clarke & Co., 2 Cir., 134 F.2d 875. Those cases, however, upon an analysis of their facts, furnish no support for plaintiff's position. The Cady case involves misrepresentations made by a broker who had negotiated the sale, including the price at which the securities were sold, and who had also negotiated his commission based upon the selling price. Neither of those factors appear in the instant case. The Schillner case likewise furnishes no authority which is persuasive in the instant case since there the broker participated in the sale as a principal.

Comparing the facts in the two above cited cases and the facts before me, it becomes quickly apparent that Fidelity performed a completely different function than those performed by the brokers in the above cases. Fidelity negotiated none of the sales of the notes in question, the transactions being consummated directly between PAC and Zanesville. Fidelity performed two functions and two functions only. The first, that of a depository of the whisky warehouse certificates and the issuance of a safekeeping receipt was purely ministerial and custodial and a normal and accepted banking function. The second, that of forwarding documents and effecting the collection of drafts was a normal and ordinary banking function. For the services which it rendered, Fidelity was compensated by a flat $2 charge for each safekeeping receipt issued regardless of the number of whisky warehouse certificates deposited and without regard to the face amount of the notes, the value of collateral whisky certificates or the number of barrels of whisky underlying them. The evidence is clear further that the $2 charge was barely sufficient to reimburse Fidelity for the bookkeeping expense involved. Fidelity also charged interest for the period of time for which it advanced credit to PAC pending collection of the drafts upon Zanesville. This charge was of course compensation for lending money and was in nowise connected with the safekeeping services heretofore described.

No cases have been cited in the excellent and exhaustive brief filed by plaintiff nor has independent research disclosed any which would lead me to the conclusion that Fidelity either sold or participated in the sale of securities. The sale of the notes was complete when Zanesville communicat-

ed its acceptance of PAC's offer directly to PAC. Fidelity had no part in that transaction, the entire negotiations being conducted directly between Zanesville, the buyer, and PAC, the seller. At most, Fidelity acted as a conduit for the transmission of papers and as a stakeholder of warehouse certificates. In addition, it forwarded drafts for collection and extended immediate credit until collection was effected. The letter of March 17, 1949 on which plaintiff places so much reliance cannot serve to make Fidelity a seller. It had been requested to furnish certain information and it did so as a banking courtesy. Fidelity's role in this series of transactions must be tested from all the facts and those facts indicate beyond question that Fidelity acted as a custodian of certain certificates, on the one hand, and acted in its normal capacity as a bank in effecting collection of drafts, on the other hand. Certainly Fidelity was not a seller under ordinary concepts of law and I am of the opinion that even under the most liberal construction of that term, Fidelity did not become a seller or participate in the sale of securities by acting as a stakeholder of the collateral and as a forwarding bank for collection of drafts. Since Fidelity is not a "seller", plaintiff has no cause of action against it under the Securities Act, and Zanesville's right to recover, if at all, must be found in some right of action under the common law.

As to the common law counts, very little consideration need be given to Fidelity's alleged negligence in failing to investigate the existence of the whisky underlying the collateral receipts. Zanesville itself had acted in exactly the same way in regard to the collateral over a period of years. There was no evidence before me to show that before the safekeeping receipt arrangement was set up that Zanesville itself had ever investigated the existence of the alleged collateral underlying the notes, nor was there any evidence before me as to any general custom of investigating the existence of such collateral. Finally, it appears clear that substantially all the information available to Fidelity was likewise available to Zanesville, and, if Fi-

delity was guilty of negligence, Zanesville was equally negligent and cannot recover. The safekeeping receipts set out the same information contained in the whisky warehouse certificates with one, in my estimation, unimportant exception. Fidelity had before it the warehouse certificates on which appeared signatures of the alleged officers of the distilleries involved. As to the certificates, Fidelity might have determined, one whether they were the names of persons who were actually properly designated officers of those companies and, two, whether the signatures were genuine. Zanesville contends that Fidelity owed it a duty to investigate the genuineness of those whisky warehouse certificates and its failure to do so constituted negligence.

Did Fidelity owe such a duty to Zanesville? The question really resolves itself into this: Did the parties contract for or was it reasonable to infer from their conduct that Fidelity, by agreeing to issue safekeeping receipts, undertook to investigate and warrant the genuineness of the signatures on the warehouse certificates. I cannot find a scintilla of evidence which would support a finding that the parties actually contracted for such an obligation on the part of Fidelity, nor can I find from the surrounding circumstances the existence of such a duty apart from contract. The factors which militate against the existence of such a duty are several and persuasive. First, the nature and amount of the charge made by Fidelity. As stated before, it was a flat charge and in an amount which barely reimbursed Fidelity for bookkeeping expenses. Second, the charge bore no relation to Fidelity's potential liability should it fail in its alleged duty. Third, the charge was not one reasonably calculated to compensate Fidelity for time and expense involved in making an investigation as to the validity of the signatures or the existence of the whisky, the real collateral underlying the notes. Finally, the testimony of the banking expert, Mr. Hayes, that it is not a customary practice for banks to investigate the validity of documents which they hold for safekeeping and for which they issue safekeeping receipts. I find, therefore, that

there was no duty on the part of Fidelity to investigate the validity and genuineness of the documents for which it issued safekeeping receipts. There being no duty, Fidelity cannot be charged with negligence for breach of it.

■■ Another common law basis for recovery advanced by plaintiff is that Fidelity was guilty of a misrepresentation of facts upon which Zanesville relied to its detriment. This ground has two aspects. First, Zanesville contends that in Fidelity's letter of March 17, 1949 relating to the balances maintained by PAC on deposit with it, a misrepresentation was made with respect to the average balances maintained. That point has been fully treated in the findings of fact set forth above and I have found as a fact that the statements made by Fidelity with respect to PAC's average balances were true and accurate and therefore could not be a basis for a charge of misrepresentation. Second, in that same letter, Zanesville charges that Fidelity misrepresented to it the facts concerning PAC's financial status. At the time Fidelity sent the letter, its officers were aware that there were certain tax liens and a judgment outstanding against Collom individually. Zanesville's letter of March 14, 1949 and defendant's reply letter of March 17, 1949 refer only to the financial condition of PAC, the corporation, and not to that of Collom, its president. Fidelity's failure to set forth Collom's financial condition constituted no misrepresentation of facts concerning PAC's financial condition.

■ The final ground advanced by the plaintiff is that Fidelity was unjustly enriched by the collection of Zanesville's draft in the amount of $19,000 and should be made to make restitution of that amount. In the findings of fact I have set forth fully the details concerning the collection of that amount by Fidelity and it appears clear to me from the evidence that at the time the item was collected by Fidelity it had no knowledge of the fraudulent practices of PAC and Collom. I find no equities, therefore, upon which to base a finding that Fidelity was unjustly enriched and to compel restitution.

## Conclusions of Law

1. The Court has jurisdiction over the parties and the subject matter of this action.

2. Fidelity was not a "seller" within the meaning of the Securities Act of 1933, 15 U.S.C.A. § 77a et seq. or the Securities Exchange Act of 1934, 15 U.S.C.A. § 78a et seq.

3. No functions performed by Fidelity in the transactions involved in the present suit constituted an offer to sell securities to Zanesville.

4. No functions performed by Fidelity in the transactions involved in the present suit constituted participation in the disposition of securities within the meaning of the Securities Act of 1933 or the Securities and Exchange Act of 1934, supra.

5. By issuing a safekeeping receipt for whisky warehouse certificates deposited with Fidelity by PAC in each of the four transactions, Fidelity did not thereby warrant the validity of said whisky warehouse certificates.

6. In issuing safekeeping receipts, Fidelity was performing a purely ministerial and custodial act and one which was a usual and customary banking service.

7. In forwarding drafts of PAC on Zanesville, drawn to the order of PAC, for collection and extending immediate credit thereon until collection, Fidelity was performing a usual and customary banking function.

8. The endorsement by Fidelity of the drafts drawn by PAC on Zanesville to the order of PAC constituted a restrictive endorsement under the provisions of section 4 of the Pennsylvania Bank Collection Act, 7 P.S. § 215. The endorsement constituted only a warranty of prior endorsements, all of which were genuine. Such endorsements did not constitute Fidelity a guarantor of the note accompanying the draft nor did it make it a participant in the sale of the note by PAC to Zanesville.

9. Fidelity owed Zanesville no duty to verify the signatures or otherwise investigate the validity or value of the whisky warehouse certificates held by Fidelity in safekeeping.

10. Fidelity owed Zanesville no duty to verify the validity of the signatures on the notes purchased directly by Zanesville from PAC.

11. Fidelity owed Zanesville no duty to state to Zanesville that it had not verified the validity and value of the whisky warehouse certificates or the validity of the signatures on the notes purchased by Zanesville from PAC.

12. Fidelity was not an agent of a distillery certificate broker within the meaning of the Pennsylvania Distillery Bonded Warehouse Certificate Act of June 24, 1939, P.L. 764, 47 P.S. § 801 et seq., and was not required to register under that Act.

13. Fidelity did not violate the provisions of the Pennsylvania Distillery Bonded Warehouse Certificate Act, supra.

14. Fidelity did not supply Zanesville with false business information upon which Zanesville relied to its detriment.

15. Fidelity did not supply to Zanesville information which it knew or could reasonably have known to be incorrect and misleading.

16. Fidelity was not negligent in failing to investigate the genuineness of the whisky warehouse certificates, the existence of the whisky collateral, and the validity of the notes sold by PAC to Zanesville.

17. In receiving the proceeds of the drafts for which Fidelity had given PAC immediate credit, Fidelity merely reimbursed itself for such advances, and did so at a time when it had no knowledge of any wrongdoing on the part of PAC. Fidelity was not thereby unjustly enriched and is not liable to Zanesville under principles of restitution.

18. Fidelity is entitled to judgment with costs of this suit.

To the extent that the above findings of fact and conclusions of law differ from the requests submitted by plaintiff and defendant, the requests of plaintiff and defendant are refused and an exception granted to each.

An appropriate order will be entered.